# No. 26-5210

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**CIC SERVICES, LLC,**

**Plaintiff-Appellant**

**v.**

**INTERNAL REVENUE SERVICE, SCOTT BESSENT, in his official capacity as Acting Commissioner of Internal Revenue, U.S. DEPARTMENT OF THE TREASURY, and UNITED STATES OF AMERICA,**

**Defendants-Appellees**

**ON APPEAL FROM THE JUDGMENT OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

## BRIEF FOR THE APPELLEES


**BRETT A. SHUMATE**
*Assistant Attorney General*
**JOSHUA WU**
*Deputy Assistant Attorney General*

**FRANCESCA UGOLINI** (202) 514-3361
**ELLEN PAGE DELSOLE** (202) 514-8128
**GEOFFREY J. KLIMAS** (202) 307-6346
*Attorneys, Tax Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

## TABLE OF CONTENTS

Page

Table of contents ..... i
Table of authorities ..... iv
Statement regarding oral argument ..... xii
Glossary ..... xiii
Jurisdictional statement ..... 1

A. District Court jurisdiction ..... 1

B. Appellate jurisdiction ..... 1

Statement of the issues ..... 2
Statement of the case ..... 3

A. The nature of the case and course of proceedings in the District Court ..... 3

B. The relevant facts ..... 4

1. Introduction ..... 4

2. The reportable transaction regime ..... 5

3. Small captive insurance arrangements and the potential for abuse ..... 7

4. Treasury identifies certain micro-captive insurance arrangements as reportable transactions subject to an affirmative disclosure requirement ..... 12

C. Proceedings in the District Court ..... 16

Summary of argument ..... 17
Argument ..... 20

The District Court correctly granted the Government's motion for summary judgment and dismissed CIC's complaint ........ 20

Standard of review ........ 20

A. Introduction: the Administrative Procedure Act ........ 21

B. The District Court correctly held that Treasury acted within its authority and engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as transactions of interest ........ 22

1. Treasury's identification of a new transaction-of-interest category was consistent with the text and purpose of I.R.C. §6011 and Treas. Reg. §1.6011-4(b)(6) ........ 23

2. Treasury's identification of a new transaction-of-interest category was reasonable and reasonably explained ........ 30

a. The relationship test is reasonable ........ 30

b. The loss-ratio and related-party financing factors are reasonable ........ 36

i. The loss-ratio factor is reasonable ........ 36

ii. The related-party financing factor is reasonable ........ 46

c. Treasury's reliance on caselaw and audits was reasonable ........ 48

3. Treasury's identification of a new transaction-of-interest category was consistent with the PATH Act ........ 52

C. The District Court correctly held that Treasury acted within its authority and engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as listed transactions ........ 56

1. Treasury's identification of a new listed-transaction category was consistent with the text and purpose of I.R.C. §6707A(c)(2) ........ 57

2. Treasury's identification of a new listed-transaction category was reasonable and reasonably explained ........ 62

D. If this Court were to reverse in whole or part, the District Court should have an opportunity to determine an appropriate remedy in the first instance ........ 69

Conclusion ........ 70
Certificate of compliance ........ 71
Addendum ........ 72

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Air Pollution Control Dist. of Jefferson Cty., Ky. v. U.S. E.P.A.*, 739 F.2d 1071 (6th Cir. 1984) .......... 21

*Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461 (2004) .......... 22

*AMERCO, Inc. v. Commissioner*, 979 F.2d 162 (9th Cir. 1992) .......... 8

*Avrahami v. Commissioner*, 149 T.C. 144 (2017).......... 11-12, 33-34, 37, 47-48

*Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87 (1983) .......... 22

*Beyond Nuclear, Inc. v. Nuclear Regulatory Comm'n*, 113 F.4th 956 (D.C. Cir. 2024) .......... 2

*Bowers v. Lawyers' Mort. Co.*, 285 U.S. 182 (1932) .......... 12

*Caylor v. Commissioner*, T.C. Memo. 2021-30.......... 37

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) .......... 62

*Chafin v. Chafin*, 568 U.S. 165 (2013) .......... 2

*Church of Scientology of Cal. v. I.R.S.*, 484 U.S. 9 (1987) .......... 51

*CIC Servs., LLC v. Internal Revenue Serv.*, 2017 WL 6016526 (E.D. Tenn. Apr. 21, 2017) .......... 8

*CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209 (2021) .......... 6, 8-9, 11, 13, 35, 44

*CIC Servs., LLC v. Internal Revenue Serv.*, 592 F. Supp. 3d 677 (E.D. Tenn. Mar. 21, 2022), *as modified by* 2022 WL 2078036 (E.D. Tenn. June 2, 2022) .......... 13, 16

*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006).......... 61

*Commissioner v. Soliman*, 506 U.S. 168 (1993) .......... 60

**Cases (cont'd):** **Page(s)**

*Dow Chem. Co. v. United States*,
435 F.3d 594 (6th Cir. 2006) .......................................... 61
*Drake Plastics Ltd. Co. v. Internal Revenue Serv.*,
830 F. Supp. 3d 611 (S.D. Tex. 2026), *appeal docketed*,
No. 26-20219 (5th Cir.) .................................. 2, 19-20, 31-34, 40, 42-47, 49, 51, 54-55, 65-68
*Dyer v. Sec'y of Health and Human Servs.*,
889 F.2d 682 (6th Cir. 1989) .......................................... 26
*Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005) .......................................... 2
*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......................................... 27
*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......................................... 22, 43
*FDA v. Wages and White Lion Invs.*,
604 U.S. 542 (2025) .......................................... 27
*Flyers Rights Educ. Fund, Inc., v. F.A.A.*,
864 F.3d 738 (D.C. Cir. 2017) .......................................... 52
*Green Rock LLC v. Internal Revenue Serv.*,
104 F.4th 220 (11th Cir. 2024) .......................................... 66, 68-69
*Harper Group v. Commissioner*,
96 T.C. 45 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992) .......................................... 33
*Helvering v. Le Gierse*,
312 U.S. 531 (1941) .......................................... 12
*Hierholzer v. Guzman*,
125 F.4th 104 (4th Cir. 2025) .......................................... 2
*HMO La., Inc. v. Dep't of Health and Human Servs.*,
179 F.4th 62 (D.C. Cir. 2026) .......................................... 27
*Humana Inc. v. Commissioner*,
881 F.2d 247 (6th Cir. 1989) .......................................... 12, 33
*Interior Glass Sys., Inc. v. United States*,
2016 WL 4717765 (N.D. Cal. Aug. 12, 2016),
*aff'd*, 927 F.3d 1081 (9th Cir. 2019) .......................................... 29
*Island Creek Coal Co. v. Wilkerson*,
910 F.3d 254 (6th Cir. 2018) .......................................... 30, 33, 42, 44

**Cases (cont'd):** **Page(s)**

*Keating v. Commissioner*,
T.C. Memo. 2024-2 ........ 37, 46
*Kirschbaum v. Walling*,
316 U.S. 517 (1942) ........ 54
*Libertarian Party of Ohio v. Husted*,
751 F.3d 403 (6th Cir. 2014) ........ 27
*Malone & Hyde, Inc. v. Commissioner*,
62 F.3d 835 (6th Cir. 1995) ........ 12
*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022) ........ 13, 23
*MD Pharm., Inc. v. Drug Enforcement Admin.*,
133 F.3d 8 (D.C. Cir. 1998) ........ 51
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........ 21, 51
*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
116 F.3d 520 (D.C. Cir. 1997) ........ 49
*Nat'l Mining Ass'n v. United Steel Workers*,
985 F.3d 1309 (11th Cir. 2021) ........ 49
*In re NTE Conn.*,
26 F.4th 980 (D.C. Cir. 2022) ........ 51-52
*Oakbrook Land Holdings, LLC v. Commissioner*,
28 F.4th 700 (6th Cir. 2022) ........ 21
*Patel v. Commissioner*,
T.C. Memo. 2024-34 ........ 37, 47
*Patel v. Commissioner*,
165 T.C. 171 (2025), *appeals docketed*,
Nos. 26-60180, 26-60181, & 26-60194 (5th Cir.) ........ 11-12, 47
*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990) ........ 55
*Puglisi v. Commissioner*,
2021 WL 7162530 (Tax Ct. Oct. 29, 2021) ........ 45
*R.V.I. Guar. Co. & Subsidiaries v. Commissioner*,
145 T.C. 209 (2015) ........ 44-45, 64-65
*Rent-A-Center, Inc. v. Commissioner*,
142 T.C. 1 (2014) ........ 48

**Cases (cont'd):** **Page(s)**

*Reserve Mechanical Corp. v. Commissioner*,
T.C. Memo. 2018-86, *aff'd*, 34 F.4th 881
(10th Cir. 2022)........................................................8, 11-12, 47
*Royalty Mgmt. Insur. Co., Ltd. v. Commissioner*,
T.C. Memo. 2024-87.......................................................................37
*Ryan, LLC v. Internal Revenue Serv.*,
2025 WL 3089415 (N.D. Tex. Nov. 5, 2025),
*appeal docketed*, No. 26-10708 (5th Cir.) ...............................41, 55
*Ryan, LLC v. Internal Revenue Serv.*,
2026 WL 1847197 (N.D. Tex. June 26, 2026),
*appeal docketed*, No. 26-10708
(5th Cir.) ............................................19, 32-33, 39-44, 47-48, 51
*Sacora v. Thomas*,
628 F.3d 1059 (9th Cir. 2010) ..............................................49, 51
*Standard Insurs. v. Internal Revenue Serv.*,
162 F.4th 1035 (10th Cir. 2025)....................................................11
*State of Neb. Dep't of Health and Human
Servs. v. Dep't of Health and Human Servs.*,
435 F.3d 326 (D.C. Cir. 2006).......................................................69
*Stearns-Roger Corp. v. United States*,
774 F.2d 414 (10th Cir. 1985) .......................................................33
*Swift v. Commissioner*,
T.C. Memo. 2024-13, *aff'd*,
144 F.4th 756 (5th Cir. 2025)........................................11, 37, 47
*Syzygy v. Commissioner*,
T.C. Memo. 2019-34.......................................................................37
*Tenn. Hosp. Ass'n v. Azar*,
908 F.3d 1029 (6th Cir. 2018) .......................................................25
*Thompson v. Commissioner*,
148 T.C. 59 (2017)..........................................................................61
*Turnham v. Commissioner*,
979 F.3d 1322 (11th Cir. 2020) .......................................................7
*U.S. SEC v. Sierra Brokerage Servs., Inc.*,
712 F.3d 321 (6th Cir. 2013) .........................................................20

**Cases (cont'd):** **Page(s)**

*U.S. Sportsmens' Alliance Found. v. Ctrs. for Disease Control and Prevention*, 167 F.4th 813 (6th Cir. 2026) .......... 21-22, 35
*United States v. Bisceglia*, 420 U.S. 141 (1975) .......... 5
*Valen Mfg. Co. v. United States*, 90 F.3d 1190 (6th Cir. 1996) .......... 62
*Wilgar Land Co. v. Dir., Office of Workers' Comp. Programs*, 85 F.4th 828 (6th Cir. 2023) .......... 25-26
*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955) .......... 54

**Statutes:**

Administrative Procedure Act (5 U.S.C.):

§551, *et seq.* .......... 4
§704 .......... 21
§706 .......... 22
§706(2)(A) .......... 21

Internal Revenue Code (26 U.S.C.):

§162 .......... 8
§831(b) .......... 10, 12, 14, 29-30, 35, 37, 43, 48, 52-56
§831(b)(1)-(2) .......... 10
§831(b)(2)(B)(i)(I) .......... 53
§831(b)(2)(B)(i)(II) .......... 53
§831(b)(2)(B)(ii)-(iii) .......... 53
§4965(a) .......... 60
§4965(e) .......... 60
§6011 .......... 5-6, 23-25
§6011(a) .......... 6
§6103 .......... 50
§6103(b)(2) .......... 51
§6111(b)(A) .......... 3

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§6501(c)(10) .......... 7
§6662A .......... 7
§6707A .......... 6, 24
§6707A(a) .......... 5
§6707A(b)(2) .......... 7
§6707A(c) .......... 6
§6707A(c)(1) .......... 5-6, 23, 34, 67
§6707A(c)(2) .......... 5-6, 57, 59-60, 67
§7213 .......... 50
§7213A .......... 50
§7431 .......... 50

28 U.S.C.:

§1291 .......... 1
§1331 .......... 1

Protecting Americans from Tax Hikes Act of 2015,
P.L. 114-113, 129 Stat. 2242, Div. Q .......... 52-53, 57
Revenue Act of 1914,
P.L. 63-217, 38 Stat. 745 .......... 10

**Regulations:**

Treasury Regulations (26 C.F.R.):

§1.6011-4 .......... 6, 24-27
§1.6011-4(a) .......... 6-7
§1.6011-4(b)(1)-(2) .......... 6, 23, 57
§1.6011-4(b)(6) .......... 6, 23
§1.6011-10 .......... 1-4, 14, 16, 18, 57-59, 66-67
§1.6011-10(b)(1) .......... 14-15, 28, 30-31, 63
§1.6011-10(b)(2)(i) .......... 15
§1.6011-10(c) .......... 15, 65

**Regulations (cont'd):** **Page(s)**

Treasury Regulations (26 C.F.R.) (cont'd):

§1.6011-10(c)(1)-(2) .......... 15, 63
§1.6011-10(d)(2) .......... 29
§1.6011-11 .......... 1-4, 14, 16, 18, 23-24, 28, 44, 56, 58-59
§1.6011-11(b)(1) .......... 14, 28, 30-31
§1.6011-11(b)(2)(i) .......... 15
§1.6011-11(b)(2)(ii) .......... 29
§1.6011-11(c)(1)-(2) .......... 14-15, 29-30, 38
§1.6011-11(d)(2) .......... 29
§1.6011-11(h)(1) .......... 29

**Miscellaneous:**

*AJCA Modifications to the Section 6011 Regulations*, 72 Fed. Reg. 43,146-01 (2007) .......... 25, 28
Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 24, 25
*Black's Law Dictionary* (12th ed. 2024) .......... 7
*Corporate Tax Shelters: Looking Under the Roof*, Hearing Before the S. Comm. on Fin., 107th Cong. (2002) .......... 50
Elaine Church & Corina Trainer, *Reportable Transactions: A Comprehensive Disclosure Regime to Combat Tax Shelters*, 57 Major Tax Planning 12 (2005) .......... 68
Fed. R. App. P. 4(a)(1)(B) .......... 1
Fed. R. Civ. P. 12(b)(6) .......... 41
Fed. R. Civ. P. 56 .......... 41
H.R. Rep. 108-548, pt. 1 (2004) .......... 6
H.R. Rep. No. 69-1 (1925) .......... 10
H.R. Rep. No. 99-426 (1985) .......... 10
https://www.irs.gov/statistics/irs-the-tax-gap (updated Apr. 14, 2026) .......... 5
https://www.merriam-webster.com/dictionary/avoid (last visited Sept. 9, 2026) .......... 60

**Miscellaneous (cont'd):** **Page(s)**

I.R.M. Exhibit 4.32.1-1 .......... 61

*Listed Transactions and Transactions of Interest*, 2023-17 I.R.B. 798 .......... 61

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21,547-01 (2023) .......... 13-14, 29, 32, 38-39, 59-60, 62, 64

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534-01 (2025) .......... 10, 14-15, 24, 27, 29, 32-33, 36-39, 41-47, 49 51, 57-60, 62, 64-65

*Transactions of Interest—Section 831(b) Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016) .......... 12-13, 16, 28-29

## STATEMENT REGARDING ORAL ARGUMENT

At issue in this appeal are two regulations designating certain micro-captive insurance arrangements as "transactions of interest" and "listed transactions," respectively, which means that taxpayers and material advisors must file reports with the Internal Revenue Service affirmatively disclosing their participation therein. The regulation designating arrangements as "transactions of interest" was upheld by the District Court below, as well as the two other district courts to pass on the regulation's validity. *Ryan, LLC v. Internal Revenue Serv.*, 2026 WL 1847197 (N.D. Tex. June 26, 2026), *appeal docketed*, No. 26-10708 (5th Cir.); *Drake Plastics Ltd. Co. v. Internal Revenue Serv.*, 830 F. Supp. 3d 611 (S.D. Tex. 2026), *appeal docketed*, No. 26-20219 (5th Cir.). The regulation designating arrangements as "listed transactions" was upheld by the District Court below, but vacated by a second district court. *Drake Plastics*, *supra*. In light of the administrative importance of these issues, counsel for the Government respectfully inform the Court that oral argument would be helpful.

## GLOSSARY

| Abbreviation | Definition |
|---|---|
| Br. | CIC's opening brief on appeal |
| CIC | CIC Services, LLC |
| the Government | Internal Revenue Service, Acting Commissioner of Internal Revenue, U.S. Department of the Treasury, and United States |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| NAIC | National Association of Insurance Commissioners |
| Notice 2016-66 | *Transactions of Interest—Section 831(b) Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016) |
| PATH Act | Protecting Americans from Tax Hikes Act of 2015, P.L. 114-113, 129 Stat. 2242, Div. Q |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |
| Treasury | U.S. Department of the Treasury and the IRS |

## JURISDICTIONAL STATEMENT

### A. District Court jurisdiction

Plaintiff CIC Services, LLC ("CIC") brought this suit against the Internal Revenue Service ("IRS"), Acting Commissioner of Internal Revenue, U.S. Department of the Treasury, and United States (collectively, "the Government") in the District Court, seeking an order relieving it, its clients, and its affiliates of the obligation to comply with Treasury Regulations ("Treas. Reg.") (26 C.F.R.) §§1.6011-10 and 1.6011-11. (Compl., RE.1, PageID#1-23.) The court had subject matter jurisdiction under 28 U.S.C. §1331.

On March 5, 2026, the District Court entered a judgment dismissing CIC's complaint pursuant to a memorandum opinion granting the Government's motion for summary judgment and denying CIC's cross-motion. (Opin., RE.46, PageID#21412-21431; Judgment, RE.47, PageID#21432.) The judgment disposed of all claims of all parties.

### B. Appellate jurisdiction

On March 16, 2026, CIC filed a timely notice of appeal. Fed. R. App. P. 4(a)(1)(B); (Not. of App., RE.48, PageID#21433-21434). This Court has jurisdiction under 28 U.S.C. §1291.

This Court's jurisdiction is unaffected by a subsequent order, issued by a different district court, which vacated Treas. Reg. §1.6011-10. *Drake Plastics Ltd. Co. v. Internal Revenue Serv.*, 830 F. Supp. 3d 611, 654 (S.D. Tex. 2026), *appeal docketed*, No. 26-20219 (5th Cir.). Because the Government has appealed from that order, its "practical impact … is not assured." *Chafin v. Chafin*, 568 U.S. 165, 175 (2013). As long as the order in *Drake Plastics* remains subject to further review, CIC's challenge to Treas. Reg. §1.6011-10—like its challenge to Treas. Reg. §1.6011-11—presents a live controversy suitable for adjudication. *See, e.g., Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n.7 (2005); *Hierholzer v. Guzman*, 125 F.4th 104, 112-13 (4th Cir. 2025); *Beyond Nuclear, Inc. v. Nuclear Regulatory Comm'n*, 113 F.4th 956, 963 n.5 (D.C. Cir. 2024).

## STATEMENT OF THE ISSUES

Under the disclosure regime established by Congress, taxpayers and material advisors must file reports with the IRS affirmatively disclosing their participation in "reportable transactions." Relevant here are two categories of reportable transactions: "transactions of interest," which are transactions that the U.S. Department of Treasury

and IRS (collectively, "Treasury") have determined have a potential for tax avoidance or evasion, and "listed transactions," which are transactions that Treasury has specifically identified as tax-avoidance transactions. The issues presented are whether the District Court correctly held that Treasury acted within its authority and engaged in reasoned decisionmaking when it promulgated (i) Treas. Reg. §1.6011-11, which identified certain micro-captive insurance arrangements as transactions of interest, and (ii) Treas. Reg. §1.6011-10, which identified certain other micro-captive insurance arrangements as listed transactions.

## STATEMENT OF THE CASE

### A. The nature of the case and course of proceedings in the District Court

CIC is a limited liability company that provides "aid, assistance, or advice" to taxpayers that participate in micro-captive insurance arrangements and is, therefore, considered a "material advisor" with respect to such arrangements that Treasury designates as reportable transactions. (King Decl., RE.21-1, PageID#173); Internal Revenue Code ("I.R.C.") (26 U.S.C.) §6111(b)(A). In 2025, Treasury promulgated regulations identifying two categories of micro-captive insurance

arrangements as reportable transactions, meaning that CIC and its clients are required to affirmatively disclose their participation in such arrangements to the IRS. Treas. Reg. §§1.6011-10, 1.6011-11.

CIC brought the instant suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §551, *et seq.*, seeking to set aside the regulations as arbitrary, capricious, and/or in excess of statutory authority. (Compl., RE.1, PageID#1-23.) The District Court issued an unpublished memorandum opinion, holding that Treasury acted within its authority and engaged in reasoned decisionmaking when it promulgated the regulations. (Opin., RE.46, PageID#21412-21431.) Consequently, the court granted the Government's motion for summary judgment, denied CIC's cross-motion, and dismissed CIC's complaint. (*Id.*)

### B. The relevant facts

#### 1. Introduction

The parties agree that micro-captive insurance arrangements can be used for tax avoidance or evasion, which makes them appropriate candidates for identification as reportable transactions. *Infra*, pp. 8-11. However, CIC disagrees with the criteria that Treasury used when it promulgated regulations that identify certain micro-captive insurance

arrangements. Below, we explain the interplay between the reportable transaction regime, the potential for taxpayers to abuse micro-captive insurance arrangements, and Treasury's decision to identify certain micro-captive insurance arrangements as reportable transactions.

### 2. The reportable transaction regime

Our federal tax system "is based on a system of self-reporting." *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). As the Supreme Court has observed, however, many taxpayers disregard their obligation to pay all the taxes they owe: "it would be naive to ignore the reality that some persons attempt to outwit the system, and tax evaders are not readily identifiable." *Id.* In the aggregate, billions of dollars go uncollected annually, commonly referred to as the "tax gap." https://www.irs.gov/statistics/irs-the-tax-gap (updated Apr. 14, 2026) (estimating the tax gap for the 2022 tax year at $696 billion). To combat the well-known "audit lottery," help close the tax gap, and best utilize the IRS's limited enforcement resources, Congress has enacted legislation requiring that taxpayers affirmatively disclose their participation in certain tax-avoidance and potential tax-avoidance transactions. I.R.C. §§6011, 6707A(a), (c)(1)-(2). The purpose of this

legislation is self-evident: "the best way [for the IRS] to combat tax shelters is to be aware of them." H.R. Rep. 108-548, pt. 1, at 261 (2004); *accord CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209, 213-14 (2021).

Under I.R.C. §6011 and Treas. Reg. §1.6011-4, taxpayers and material advisors must file forms with the IRS to affirmatively disclose their participation in "reportable transactions." I.R.C. §§6011(a), 6707A(c); Treas. Reg. §1.6011-4(a). Included in the definition of reportable transactions are "transactions of interest" and "listed transactions." I.R.C. §6707A(c); Treas. Reg. §1.6011-4(b)(1)-(2), (6). Transactions of interest are transactions that the Secretary of the Treasury has determined have "a potential for tax avoidance or evasion" and identified by appropriate guidance (as relevant here, a regulation). I.R.C. §6707A(c)(1); Treas. Reg. §1.6011-4(b)(1), (6). Listed transactions are transactions that the Secretary has "specifically identified … as a tax avoidance transaction" by appropriate guidance (here again, a regulation). I.R.C. §6707A(c)(2); Treas. Reg. §1.6011-4(b)(1)-(2).

The disclosure requirements under I.R.C. §6011 and Treas. Reg. §1.6011-4 are backed by civil penalties, which are codified at I.R.C.

§6707A. *See also* I.R.C. §6662A. The criteria for identifying an arrangement as a listed transaction are generally more stringent than the criteria for other reportable transactions, such as transactions of interest; therefore, participation in a listed transaction carries the potential for a higher maximum penalty. I.R.C. §6707A(b)(2); *see also* I.R.C. §6501(c)(10). Nonetheless, the fact that an arrangement is a reportable transaction, including a listed transaction, "shall not affect the legal determination of whether the taxpayer's treatment of the transaction is proper." Treas. Reg. §1.6011-4(a)*; accord Turnham v. Commissioner*, 979 F.3d 1322, 1326 (11th Cir. 2020).

### 3. Small captive insurance arrangements and the potential for abuse

a. Insurance generally involves an insurer entering into a contract with a third party, wherein the insurer agrees to compensate that party (the insured) if it experiences a loss from a specified risk. *Black's Law Dictionary* (12th ed. 2024). In exchange for such coverage, the insured pays the insurer an agreed-upon premium. *Id.*

Conventional insurance arrangements occur through the commercial marketplace, where the insurer and insured are unrelated parties negotiating at arm's length, and the insured has no interest in,

or control over, the premiums after remitting them to the insurer. Accordingly, although the insured may claim a deduction under I.R.C. §162 for premiums paid, the insured has no incentive—tax or otherwise—to purchase unnecessary insurance or pay premiums in excess of fair market value. "From the standpoint of the insured there can be no profit from" the risk covered by the insurance. *AMERCO, Inc. v. Commissioner*, 979 F.2d 162, 167 (9th Cir. 1992). That is, even if the event insured against never occurs (or occurs and the resulting loss is fully covered by the insurance), the insured will still be poorer by the amount of premiums paid.

b. The incentives change, however, in so-called "captive" insurance arrangements where the insurer and its insured(s) are affiliated parties. *Reserve Mechanical Corp. v. Commissioner*, T.C. Memo. 2018-86, *aff'd*, 34 F.4th 881, 885 (10th Cir. 2022) (citing *CIC Servs.*, 593 U.S. at 213). As CIC's principal and founder Sean King has acknowledged, "captive insurance arrangements can 'most definitely' be used for tax avoidance or evasion purposes." *CIC Servs., LLC v. Internal Revenue Serv.*, 2017 WL 6016526, at *2 (E.D. Tenn. Apr. 21, 2017).

Such avoidance or evasion can occur where one or more affiliated insureds pay (often excessive) amounts as insurance premiums to a captive insurer for contracts that the parties label as insurance contracts, but the manner in which the contracts are interpreted, administered, and applied is inconsistent with arm's-length transactions and sound business practices. Such contracts also may provide coverage that the insureds do not really need. On the insureds' side, this generates large deductions that decrease their current taxable income. Because the insureds and the insurer are under common control, the insureds (or their owners) never really lose control of the funds. And although the insurer may nominally provide insurance to unrelated parties, tax-avoidance captive arrangements are structured so that there is little or no risk that the insurer will have to pay any significant loss suffered by such parties. *CIC Servs.,* 593 U.S. at 213-24.

c. The risk of tax avoidance or evasion is magnified in arrangements involving a small captive insurer, often referred to as a "micro-captive." For over a century, Congress has provided special tax treatment to small and mutual insurers, which were "traditionally held by their members in a given geographic location 'solely for the

protection of their own property and not for profit.'" *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534-01, 3,555 (2025) (quoting Revenue Act of 1914, P.L. 63-217, 38 Stat. 745, 762). "These small insurers, including groups of farmers and fire associations, were exempt from ordinary income tax laws and were understood to collect funds only up to what was needed for losses and expenses." *Id.* (citing H.R. Rep. No. 69-1, at 9 (1925).

In 1986, Congress enacted I.R.C. §831(b) with the goal of simplifying the law applicable to small and mutual insurers.[1] 90 Fed. Reg. at 3,539 (citing H.R. Rep. No. 99-426, at 678 (1985)). As amended in 2015, §831(b) provides that small insurers (other than life insurance companies) can exclude up to $2.2 million of premium income (adjusted for inflation) from their taxable income. I.R.C. §831(b)(1)-(2). Thus, in captive arrangements involving small insurers, the potential tax benefit is twofold: (i) on the insureds' side, the payment of premiums generates deductions that reduce taxable income and (ii) on the insurers' side, the

[1] CIC asserts that Congress enacted I.R.C. §831(b) "to encourage" small business to form captive insurance arrangements. (Br. 5.) However, nothing in the text, structure, or history of §831(b) suggests it was enacted with captive insurance arrangements in mind. 90 Fed. Reg. at 3,539.

premiums received are excluded from taxable income. *Standard Insurs. v. Internal Revenue Serv.*, 162 F.4th 1035, 1039 (10th Cir. 2025). "The result is that the money does not get taxed at all." *CIC Servs.*, 593 U.S. at 213.

Of course, the decision not to tax the premium income of small insurance companies, "for better or worse, is a congressional choice." *CIC Servs.,* 593 U.S. at 213. But "these tax benefits should only accrue if the money is 'really for insurance.'" *Swift v. Commissioner*, T.C. Memo. 2024-13, *aff'd*, 144 F.4th 756, 761 (5th Cir. 2025) (quoting *CIC Servs.*, 593 U.S. at 213). The IRS and courts have determined that many micro-captive insurance arrangements are not, in fact, insurance for federal tax purposes and therefore not entitled to the tax benefits that inure thereto. *E.g.*, *Swift*, 144 F.4th at 768-69; *Reserve Mechanical*, 34 F.4th at 915-17; *Patel v. Commissioner*, 165 T.C. 171, 200 (2025), *appeals docketed*, Nos. 26-60180, 26-60181, & 26-60194 (5th Cir.); *Avrahami v. Commissioner*, 149 T.C. 144, 197-99 (2017).

Courts generally evaluate whether an arrangement constitutes insurance for federal tax purposes based on whether it: (1) involves insurable risks, (2) shifts the risk of loss to the insurer, (3) distributes

the risk among policyholders, and (4) constitutes insurance in the commonly accepted sense. *E.g.*, *Reserve Mechanical*, 34 F.4th at 904; *see Humana Inc. v. Commissioner*, 881 F.2d 247, 251 (6th Cir. 1989) (citing *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941)). In some cases, courts have also applied traditional anti-abuse doctrines, like the sham-transaction and economic-substance doctrines. *E.g.*, *Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835, 840-41 (6th Cir. 1995); *Patel*, 165 T.C. at 194-98. Regardless of framing, courts look beyond the formalities and consider the character of the business actually done. *Avrahami*, 149 T.C. at 192 (citing *Malone & Hyde*, 62 F.3d at 842-43); *see also Bowers v. Lawyers' Mort. Co.*, 285 U.S. 182, 188 (1932).

#### 4. Treasury identifies certain micro-captive insurance arrangements as reportable transactions subject to an affirmative disclosure requirement

Against this backdrop, Treasury issued *Transactions of Interest—Section 831(b) Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016) ("Notice 2016-66"), which identified certain micro-captive insurance arrangements as transactions of interest that needed to be affirmatively reported to the IRS. The goal of this designation, like any other reportable transaction designation, was to

arm the IRS with information about covered arrangements so "the IRS can check for facts … suggesting that the taxpayer is not entitled to the tax benefit it claims." *CIC Servs.*, 593 U.S. at 213-14. However, in a suit filed by CIC, a court vacated Notice 2016-66 because it determined that the Notice should have been promulgated via notice-and-comment rulemaking and was not supported by the administrative record submitted in connection therewith. *CIC Servs., LLC v. Internal Revenue Serv. ("CIC Services I")*, 592 F. Supp. 3d 677, 683-88 (E.D. Tenn. Mar. 21, 2022), *as modified by* 2022 WL 2078036 (E.D. Tenn. June 2, 2022) (McDonough, J.); *see Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142-48 (6th Cir. 2022) (reportable transactions must be identified by regulation). Treasury therefore obsoleted Notice 2016-66. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21,547-01, 21,553 (2023).

Treasury also set out to create a new reporting requirement for micro-captive insurance arrangements that would address the infirmities identified in *CIC Services I*, *supra*. 88 Fed. Reg. at 21,547. In doing so, Treasury reviewed caselaw evaluating what constitutes insurance, current examinations of taxpayers claiming tax benefits that

inure to insurance companies, industry data, expert reports, and stakeholder comments. 90 Fed. Reg. at 3,542-43, 3,538; 88 Fed. Reg. at 21,552-53, 21,557; (Admin. Rec. Index, RE.20-2, PageID#127-128.) All told, Treasury compiled a 24,000-page administrative record. (*Id.*, PageID#119-128.)

The final regulations that emerged from the rulemaking process established two categories of reportable transaction: (i) transactions of interest, which Treasury determined have a potential for tax avoidance or evasion, and (ii) listed transactions, which Treasury specifically identified as tax-avoidance transactions. Treas. Reg. §§1.6011-10, 1.6011-11. An arrangement falls within the transaction-of-interest category if it satisfies (i) the relationship test and (ii) either a modified loss-ratio factor or a related-party financing factor. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1), (c)(1) & (2). In particular, the relationship test is satisfied if the arrangement involves a small, closely held captive insurer that made an election under I.R.C. §831(b), which creates an opportunity to engage in tax avoidance or evasion. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1); 90 Fed. Reg. at 3,539, 3,550-52; 88 Fed. Reg. at 21,552. The loss-ratio factor is satisfied if, over a period

of 10 years (or the entirety of the captive's existence, if it had existed for under 10 years), the captive produced a loss-ratio of less than 60%,[2] which was below the industry average and therefore a strong indicator that the captive was charging excessive premiums. Treas. Reg. §1.6011-11(c)(2); 90 Fed. Reg. at 3,540-41, 3,546. And the financing factor is satisfied if, within the last five years, the captive had agreed to loan premium payments back to its commonly owned insureds or other affiliates, which was indicative of a circular flow of funds. Treas. Reg. §§1.6011-10(b)(2)(i), 1.6011-11(b)(2)(i) & (c)(1); 90 Fed. Reg. at 3,546.

An arrangement falls within the listed-transaction category only if it satisfies a more stringent test. Like the transaction-of-interest category, the listed-transaction category includes the relationship test, modified loss-ratio factor, and related-party financing factor. Treas. Reg. §1.6011-10(b)(1), (c)(1) & (2). However, instead of having to satisfy either the loss-ratio factor or the financing factor, an arrangement qualifies as a listed transaction only if it satisfies both. *Id.* §1.6011-

---

[2] As discussed at p. 38 n.3, *infra*, the regulations calculate an insurer's loss ratio as the sum of the amounts paid out in claims and claim administration expenses, divided by the difference between premiums earned and policyholder dividends paid.

10(c). Furthermore, the loss ratio is significantly reduced, from 60% to 30%, and can only be satisfied if the captive has been in existence for at least 10 years and maintained a loss ratio below 30% for the most recent 10 years. *Id.* §1.6011-10(b)(2)(ii), (c)(2).

### C. Proceedings in the District Court

Just as it did after Treasury issued Notice 2016-66, CIC filed a district-court suit seeking to vacate the new reporting requirements. (Compl., RE.1, PageID#1-23.) Once again, CIC's suit was assigned to Judge McDonough. This time, though, the District Court held that Treasury had learned its lessons from *CIC Services I* and produced compliant rules. (Opin., RE.46, PageID#21412-21431.) Accordingly, the court denied CIC's motion for summary judgment, granted the Government's cross-motion, and dismissed CIC's complaint. (Judgment, RE.47, PageID#21432.)

In doing so, the District Court held that "the administrative record reflects" Treas. Reg. §§1.6011-10 and 1.6011-11 "are a result of reasoned decision making and [Treasury's] longstanding concern that captive arrangements may be used for tax avoidance." (Opin., RE.46, PageID#21430.) Furthermore, the court held that Treasury had

reasonably explained how each of the criteria in the regulations—*i.e.*, the relationship test, loss ratio factor, and financing factor—"aid[s] in identifying potentially tax-avoidant transactions." (*Id.*, PageID#21428, 21424-21429.) The court also emphasized that no arrangement was reportable if only one of the criteria was satisfied; rather, the transaction-of-interest rule required that two of the three criteria be satisfied, and the listed-transaction rule required that all three be satisfied. (*Id.*, PageID#21427-21428.) Finally, the court rejected CIC's argument that the regulations were arbitrary and capricious because they were potentially overinclusive, as they merely "triggered reporting requirements that may allow the Treasury Department and IRS to more accurately identify whether certain arrangements are 'for insurance.'" (*Id.*, PageID#21428-21429.)

## SUMMARY OF ARGUMENT

Congress has authorized Treasury to designate arrangements that it has determined are of a type that has a potential for tax avoidance or evasion as "reportable transactions," of which "transactions of interest" are a subcategory, and to designate arrangements that it has specifically identified as tax-avoidance transactions as "listed

transactions." Treasury exercised that authority when it promulgated Treas. Reg. §§1.6011-10 and 1.6011-11, which designated certain micro-captive insurance arrangements as "transactions of interest" and "listed transactions." Taxpayers remain free to participate in such arrangements, but they must affirmatively disclose their participation so that the IRS can determine whether to conduct examinations and, if appropriate, disallow the tax benefits claimed.

Although CIC has acknowledged that captive insurance arrangements can "most definitely" be used for tax avoidance or evasion, it argues that the particular reporting requirements established by Treasury were arbitrary, capricious, and/or in excess of authority. The District Court correctly rejected these arguments and upheld the regulations.

1. The administrative record demonstrates that each of the three criteria used by Treasury to identify transactions of interest was reasonably designed to capture arrangements with a potential for tax avoidance or evasion. First, the relationship test limits the rule to small, closely held captives, as the risk of a tax-avoidant transaction is greater where the relevant parties are under common control. Second,

the loss-ratio factor focuses on arrangements in which a below-average loss ratio indicates that premiums are consistently being priced in a way that does not reflect arm's-length dealing or, relatedly, that the captive is merely a savings vehicle for its policyholders. Third, the related-party financing factor focuses on arrangements in which the captive insurer loans premium payments back to the insured that paid them, creating a circular flow of funds. Two other district courts have now joined the District Court here in holding that the transaction-of-interest rule is reasonable and reasonably explained, confirming that the holding is sound. *Ryan, LLC v. Internal Revenue Serv.*, 2026 WL 1847197, at *9-16 (N.D. Tex. June 26, 2026), *appeal docketed*, No. 26-10708 (5th Cir.); *Drake Plastics*, 830 F. Supp. 3d at 642-51.

2. The administrative record similarly demonstrates that Treasury acted reasonably in using more stringent criteria to specifically identify micro-captive listed transactions as tax-avoidance transactions. Unlike the transaction-of-interest rule, which kicks in if two of the three criteria are satisfied, the listed-transaction rule only kicks in if all three are satisfied. Just as important, the loss-ratio factor was reduced to 30%, substantially below the 60% loss ratio used in the

transaction-of-interest rule (which was itself below the industry average). And even then, the loss ratio must stay below 30% for at least 10 years—enough to demonstrate that premiums are consistently and repeatedly priced in a way that is inconsistent with arm's-length dealing and/or reflects that the arrangement is merely a savings vehicle.

Candidly, another district court has since held the listed-transaction regulation invalid. *Drake Plastics*, *supra.* But the court did so by creating a standard under which Treasury must identify and examine the full universe of tax-avoidance transactions before imposing a reporting requirement, which is neither dictated by the statutory scheme nor workable in practice.

The judgment of the District Court should be affirmed.

## ARGUMENT

### The District Court correctly granted the Government's motion for summary judgment and dismissed CIC's complaint

### Standard of review

This Court reviews *de novo* the grant and denial of cross-motions for summary judgment. *U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013).

### A. Introduction: the Administrative Procedure Act

The Administrative Procedure Act provides for judicial review of final agency action for which there is no other adequate remedy at law. 5 U.S.C. §704. In reviewing agency action, courts apply an "arbitrary and capricious" standard. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); 5 U.S.C. §706(2)(A). Under this standard, courts "may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency." *State Farm*, 463 U.S. at 42-43; *see also Air Pollution Control Dist. of Jefferson Cty., Ky. v. U.S. E.P.A.*, 739 F.2d 1071, 1083 (6th Cir. 1984). So framed, the scope of review is "extremely narrow," and "[a] court may not substitute its judgment for that of the agency." *Oakbrook Land Holdings, LLC v. Commissioner*, 28 F.4th 700, 720 (6th Cir. 2022); *see U.S. Sportsmens' Alliance Found. v. Ctrs. for Disease Control and Prevention*, 167 F.4th 813, 822 (6th Cir. 2026) ("Nor … are we in the business of micromanaging or second-guessing the effectiveness of agency regulations when reviewing for rationality.").

Ultimately, courts should sustain agency action if they determine that the agency acted "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 105 (1983). "In other words, the 'agency action' must 'be reasonable and reasonably explained.'" *U.S. Sportsmens' Alliance*, 167 F.4th at 821 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). This determination is made by reviewing the agency's action in light of "the whole [administrative] record or those parts of it cited by a party." 5 U.S.C. §706. Even if the agency explains its decision "with less than ideal clarity," the decision will nonetheless be sustained if the record allows "the agency's path [to] reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004).

### B. The District Court correctly held that Treasury acted within its authority and engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as transactions of interest

The District Court held that the transaction-of-interest rule passed muster as a matter of both procedure and substance. Since then, two other district courts have likewise held that the rule was reasonable and reasonably explained. This Court should affirm the

considered judgment of these three courts and hold that Treasury acted within its authority and engaged in reasoned decisionmaking in promulgating Treas. Reg. §1.6011-11.

**1. Treasury's identification of a new transaction-of-interest category was consistent with the text and purpose of I.R.C. §6011 and Treas. Reg. §1.6011-4(b)(6)**

a. Before turning to the specific criteria that Treasury used to identify certain micro-captive insurance arrangements as transactions of interest, we address the procedural steps that Treasury must follow when it establishes a new transaction-of-interest category. By statute, a "reportable transaction" is a type of transaction that Treasury has determined has "a potential for tax avoidance or evasion." I.R.C. §6707A(c)(1). Pursuant to I.R.C. §6011, Treasury has promulgated a regulation defining "transactions of interest" as a subcategory of "reportable transaction" that has been identified in an appropriate "form of published guidance." Treas. Reg. §1.6011-4(b)(1), (6). And this Court has held that the appropriate form of published guidance is a regulation promulgated via notice-and-comment rulemaking. *Mann Constr.,* 27 F.4th at 1142-48. Thus, to establish a new transaction-of-interest category, Treasury must: (i) determine that an arrangement

has the potential for tax avoidance or evasion and (ii) promulgate a regulation identifying that arrangement as a transaction of interest.

There is no dispute that Treasury followed these steps here. First, it determined that the micro-captive arrangements covered by Treas. Reg. §1.6011-11 have the potential for tax avoidance or evasion. 90 Fed. Reg. at 3,538. Second, it identified those arrangements in a regulation that was the product of notice-and-comment rulemaking. *Supra*, pp. 13-16.

b. CIC nonetheless argues that Treasury failed to comply with its "duty to identify a need for more information" for the purpose of "determin[ing] how to classify small-captive transactions in the future." (Br. 29-30.) This argument fails for the simple reason that no such duty exists.

CIC's proposed duty-to-identify requirement appears nowhere in the text of I.R.C. §6011, I.R.C. §6707A, or Treas. Reg. §1.6011-4. CIC derives this requirement solely from §1.6011-4's preamble. (Br. 29.) While a preamble may "shed light on the meaning of the operative provisions that follow," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012), it "cannot … add

substantive duties that the regulations themselves do not contain," *Wilgar Land Co. v. Dir., Office of Workers' Comp. Programs*, 85 F.4th 828, 837 (6th Cir. 2023). Thus, where a preamble expresses a specific purpose but the operative text is more general, the former "will not limit" the latter. *Reading Law* at 219. Put another way, a court errs to the extent it uses a preamble to create, rather than resolve, an ambiguity in the operative text. *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1044 (6th Cir. 2018). This Court should avoid committing such an error here, where CIC urges it to use Treas. Reg. §1.6011-4's preamble to engraft an atextual limitation onto the regulation's unambiguous text.

Moreover, Treas. Reg. §1.6011-4's preamble disclaims any intent to narrow the regulatory definition of "transaction of interest." As CIC notes (Br. 29), the preamble describes a transaction of interest as an arrangement that Treasury has determined meets the criteria to be identified as a "reportable transaction," but for which it lacks sufficient information to designate it a "listed transaction." *AJCA Modifications to the Section 6011 Regulations*, 72 Fed. Reg. 43,146-01, 43,136 (2007). But the preamble further states that, despite requests for "more

specificity and guidance on the definition of what constitutes a transaction of interest," Treasury had chosen not include any such limitation in the regulation:

> The IRS and Treasury Department believe that providing a [more] specific definition for the transactions of interest category in the regulations would unduly limit the IRS and Treasury Department's ability to identify transactions that have the potential for tax avoidance and evasion.

*Id.* at 43,137. This Court should decline CIC's invitation to rewrite the regulation to do otherwise.

c. CIC tries to recast the preamble to Treas. Reg. §1.6011-4 as a Treasury "policy" (Br. 29-31), but to no avail. Apart from calling the preamble a "policy," CIC identifies nothing suggesting that Treasury intended to establish policy thereby. Nor would recasting the preamble as a policy necessarily make it binding on Treasury, as CIC suggests. It is well established that not all agency policies are binding, *Dyer v. Sec'y of Health and Human Servs.*, 889 F.2d 682, 685 (6th Cir. 1989), and this Court's precedent makes clear that the preamble to a regulation "is not binding," *Wilgar Land*, 85 F.4th at 837.

Of course, under the change-in-position doctrine, "[a]n agency may not … depart from a prior policy *sub silentio* or simply disregard rules

that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (Br. 31). But the Supreme Court has "traditionally applied the change-in-position doctrine" to guidance "expressed in a more formal setting," such as binding regulations, enforcement orders, or processes "that effectively resemble[ ] adjudication." *FDA v. Wages and White Lion Invs.*, 604 U.S. 542, 569 n.5 (2025) (citations and internal quotations omitted). There is no basis to extend the doctrine to nonbinding guidance that—like the preamble to Treas. Reg. §1.6011-4—was not intended to establish agency policy, much less engender reliance interests. *See*, *e.g.*, *HMO La., Inc. v. Dep't of Health and Human Servs.*, 179 F.4th 62, 71-72 (D.C. Cir. 2026); *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 423-24 (6th Cir. 2014).

d. In any event, Treasury's identification of certain micro-captive insurance arrangements as transactions of interest was entirely consistent with the preamble to Treas. Reg. §1.6011-4. Treasury appropriately identified the arrangements as transactions of interest after determining that they "potentially give[ ] rise to tax avoidance," 90 Fed. Reg. at 3,555. Once Treasury has had an opportunity to collect

and review disclosures made pursuant to Treas. Reg. §1.6011-11, it "may take one or more actions," including "removing" some or all the arrangements "from the transaction of interest category," "designating" some or all the arrangements "as a listed transaction," or "providing a new category of reportable transaction." 72 Fed. Reg. at 43,147. But there is no reason that Treasury must mechanically recite these options every time it identifies a new transaction-of-interest category, as CIC suggests. (Br. 30-31.)

Nor is there merit to CIC's contention that it is "[im]plausible" that Treasury needs to gather more information about micro-captive insurance arrangements. (Br. 31.) Although Treasury collected a significant amount of information about micro-captives pursuant to Notice 2016-66, CIC is wrong that this information is "nearly coterminous" with what is being collected under Treas. Reg. §1.6011-11. (Br. 30.) Under the plain terms of §1.6011-11, the new transaction-of-interest category—unlike the old category—includes holders of derivative interests, beneficiaries of trusts, and others in the definition of "captive." Treas. Reg. §§1.6011-10(b)(1), §1.6011-11(b)(1). In addition, the new category excludes, among other arrangements,

captives that revoked their I.R.C. §831(b) elections or offer certain types of consumer coverage. Treas. Reg. §§1.6011-10(d)(2), 1.6011-11(d)(2) & (h)(1). Furthermore, the new category excludes arrangements with a loss ratio between 60% and 70%. Treas. Reg. §1.6011-11(c)(2). And the loss ratio is now calculated over a period of up to 10 years, rather than five years. Treas. Reg. §1.6011-11(b)(2)(ii).

More importantly, Notice 2016-66 was obsoleted in 2023 and did not capture information about variations in micro-captives that have been promoted during the past three years. 88 Fed. Reg. at 21,553. As Treasury explained, it was aware that new material advisors and taxpayers were entering the captive space and, consequently, it needed to collect information "to identify who the participants are and the nature of their transactions." 90 Fed. Reg. at 3,555-56; *see also Interior Glass Sys., Inc. v. United States*, 2016 WL 4717765, at *1 (N.D. Cal. Aug. 12, 2016), *aff'd*, 927 F.3d 1081 (9th Cir. 2019) (discussing promoter's attempts to avoid disclosure requirements by modifying the transaction he marketed). CIC wholly fails to engage with this reasoning and has, therefore, forfeited any argument that it is arbitrary

and capricious. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (arguments not raised in opening brief are waived).

### 2. Treasury's identification of a new transaction-of-interest category was reasonable and reasonably explained

We now turn to the substance of the transaction-of-interest rule. As relevant here, a taxpayer or material advisor must disclose its participation in an insurance arrangement if the arrangement satisfies both (a) the relationship test and (b) either the loss-factor ratio or related-party financing factor. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1), (c)(1) & (2). Each aspect of this test is reasonable and reasonably explained, as the District Court and two other district courts have now held.

#### a. The relationship test is reasonable

As discussed at p. 14, *supra*, an insurance arrangement must meet certain structural characteristics to fall within the transaction-of-interest category. To wit, the arrangement must involve a small, closely held insurance company that elects, under I.R.C. §831(b), not to be taxed on its premium income. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1). For purposes of the rule, an insurance company is closely held

if at least 20% of its assets, voting power, or outstanding stock or equity interests is directly or indirectly owned by an insured party, an owner of an insured party, or persons related thereto. *Id.* §§1.6011-10(b)(1)(iii), 1.6011-11(b)(1). Treasury reasonably determined that this structure creates an opportunity to avoid or evade taxes.

i. Initially, the relationship test is designed to ensure that the reporting requirement only covers captive insurance arrangements, not arrangements in which the insurer and insured are unrelated parties operating at arm's-length. *Drake Plastics*, 830 F. Supp. 3d at 628 ("The Relationship Test puts the 'captive' in the "micro-captive" regulations."). This is eminently reasonable, because the IRS, courts, and CIC all agree that captive insurance arrangements can be used for tax avoidance or evasion. *Supra*, pp. 8-11.

Additionally, the relationship test focuses on captive insurance arrangements where ownership or control is concentrated among a small number of related individuals or entities. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1). This, too, is reasonable, as "the closely held nature of the arrangement"—combined with common ownership between the insurer and the insureds—creates an opportunity to

conduct business in a manner inconsistent with arm's-length transactions and sound business practices. 90 Fed. Reg. at 3,539, 3,552; *see also id.* at 3,550-51 ("Because these transactions involve closely held related entities, there is little to no barrier to the manufacture of claims in these arrangements."); 88 Fed. Reg. at 21,552 (rule "identif[ies] a threshold at which a lack of diversification may facilitate abuse"). And the rule's 20% threshold is drawn from the test that Congress devised to curtail closely held family businesses' improper use of captive insurance arrangements for estate-planning purposes, rather than risk management. 88 Fed. Reg. at 21,552; *infra*, pp. 52-54.

Furthermore, as the District Court concluded, the relationship test is designed "to exclude captive arrangements" where the ownership structure is too dispersed to create a significant "potential for tax avoidance, such as small mutual insurers with diversified ownership." (Opin., RE.46, PageID#21428); *accord Drake Plastics*, 830 F. Supp. 3d at 628. Put simply, the relationship test "is reasonable and reasonably explained." *Ryan*, 2026 WL 1847197, at *16.

CIC hurries past the reasoning employed by Treasury and the District Court, baldly asserting that they "fail[ ] to supply any

reasoning to support the 20% Relationship Test." (Br. 45.) But by failing to engage with the reasoning actually employed, CIC has forfeited any challenge to the sufficiency thereof. *See Island Creek Coal*, 910 F.3d at 256.

ii. CIC points out that a *bona fide* insurance arrangement "can be present when policyholders are related." (Br. 44.) We agree. But it does not follow that the arrangement's ownership structure is "irrelevant," as CIC urges. *Drake Plastics*, 830 F. Supp. 3d at 643 (rejecting this argument). To the contrary, the risk that an insurer is "acting as a mere self-insurance reserve or otherwise not acting as a legitimate insurance provider is heightened when the insurer and the insured are under common ownership." *Id.* at 643; *see Ryan*, 2026 WL 1847197, at *2. This bears directly on the question whether the insured has, in fact, transferred its risk of loss, as required to constitute insurance for federal tax purposes. 90 Fed. Reg. at 3,539-40 (citing *Harper Group v. Commissioner*, 96 T.C. 45, 46 n.2 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992); *Stearns-Roger Corp. v. United States*, 774 F.2d 414, 415 (10th Cir. 1985)); *see Humana*, 881 F.2d at 251-52 (citing *Stearns-Roger*); *Avrahami*, 149 T.C. at 174; 90 Fed. Reg. at 3,538

(citing *Avrahami*). Consequently, the District Court correctly rejected CIC's argument that the relationship test was "premised on impermissible factors." (Opin., RE.46, PageID#21429.) This Court should do likewise.

Implicit in CIC's contrary argument seems to be the assumption that the transaction-of-interest rule is invalid because it may not perfectly capture the precise contours of potentially tax-avoidant insurance arrangements. But a transaction of interest—like other species of reportable transactions—need only be "*of a type* which the Secretary determines as *having a potential* for tax avoidance or evasion." I.R.C. §6707A(c)(1) (emphasis added); *Drake Plastics*, 830 F. Supp. 3d at 633 (recognizing the "low bar" for an arrangement to be designated a "reportable transaction"). Here, Treasury reasonably concluded that the risk of an illegitimate transaction "is higher where companies are related and controlled by common ownership." *Drake Plastics*, 830 F. Supp. 3d at 644 (collecting cases). The reporting requirement based, in part, on the insurer's ownership structure, is therefore appropriate so that the IRS can, armed "[w]ith that information, … check for facts—like coverage for an implausible risk or

premiums that significantly exceed prevailing rates—suggesting that the taxpayer is not entitled to the tax benefit it claims." *CIC Servs.*, 593 U.S. at 213-14.

Indeed, even outside the reportable-transaction context, it is well-established that a regulation is not arbitrary and capricious simply because it "might be over- or under-inclusive." *U.S. Sportsmens' Alliance*, 167 F.4th at 822. Where Treasury has "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," this Court should decline CIC's invitation to second-guess the degree to which the regulations are "truly necessary or effective." *Id.* at 821-22.

At all events, the transaction-of-interest rule does not require that an insurance arrangement be reported simply because it involves a small, closely held captive. Rather, the rule only kicks in for a small, closely held captive if it excludes premiums from income under I.R.C. §831(b) and either the loss-ratio or related-party financing factor is also satisfied.

### b. The loss-ratio and related-party financing factors are reasonable

As we have explained, the District Court correctly held that Treasury engaged in reasoned decisionmaking when it determined that an opportunity to potentially evade or avoid taxes exists where a small, closely held captive's ownership or control is concentrated among a small number of related individuals or entities. The court also correctly determined that Treasury engaged in reasoned decisionmaking when it determined that, where such a captive also satisfies the transaction of interest's loss-ratio or related-party financing factor, the arrangement may, in fact, have been used to avoid or evade tax and warrants additional scrutiny.

#### i. The loss-ratio factor is reasonable

a. Treasury's central concern with micro-captive insurance arrangements is that taxpayers may use them not as a legitimate risk-management device, but rather to achieve "the indefinite deferral of tax." 90 Fed. Reg. at 3,546. One telltale sign of a tax-avoidant arrangement is that the insured pays outsized premiums for coverage that it does not really need. *Supra*, p. 9. As such, it is a "strong indicator of tax avoidance" if an insured pays "premiums far in excess of

what is reasonably needed to fund insurance operations." 90 Fed. Reg. at 3,540; *see id.* ("excessive pricing of premiums and artificially low or nonexistent claims activity" is "inconsistent with insurance for Federal tax purposes"). After all, "[t]he pricing of premiums should naturally reflect the economic reality of insurance operations, to ensure that policies are 'price[d] in such a way that the premiums brought in cover losses and the insurer's business expenses with enough profit left over to keep investors happy.'" *Id.* at 3,540 (quoting *Avrahami*, 149 T.C. at 152). Where those economic realities are consistently ignored, it is apparent that the arrangement is being used to maximize the tax benefits available under I.R.C. §831(b) "without regard to reasonable estimates for loss experience." 90 Fed. Reg. at 3,541 (citing *Avrahami*, 149 T.C. at 194-98; *Syzygy v. Commissioner*, T.C. Memo. 2019-34, at *33-34; *Caylor v. Commissioner*, T.C. Memo. 2021-30, at *45-47; *Keating v. Commissioner*, T.C. Memo. 2024-2, at *59-61; *Swift*, T.C. Memo. 2024-13, at *40-42; *Patel v. Commissioner*, T.C. Memo. 2024-34, at *48-50; *Royalty Mgmt. Insur. Co., Ltd. v. Commissioner*, T.C. Memo. 2024-87, at *23, 46-48).

To address this concern, the transaction-of-interest rule focuses on captive insurance arrangements in which the insurer has a below-average loss ratio. 90 Fed. Reg. at 3,541-43. In its simplest terms, a loss ratio is the sum of the expenses that an insurer incurs paying claims and claim-related expenses, divided by the amount collected in premiums:

$$\text{loss ratio} = \frac{\text{(incurred losses + claim expenses)}}{\text{earned premiums}}$$

88 Fed. Reg. at 21,553.[3] A legitimate insurer operating at arm's length with a consistently low loss ratio would, as a matter of economics, be expected to lower its premiums (or issue dividends to policyholders) to avoid losing customers to competitors charging lower premiums. 90 Fed. Reg. at 3,540-41. It is unsurprising, then, that "a litany of data suggest[s] that micro-captives involved in tax-avoidance schemes

---

[3] The National Association of Insurance Commissioners ("NAIC") calculates an insurer's annual loss ratio as the sum of the net amounts paid out in claims and claim administration expenses, divided by net premiums earned. 88 Fed. Reg. at 21,553. The regulation's methodology differs from NAIC's insofar as it adds additional claim administration expenses to the numerator, subtracts policyholder dividends from the denominator, and is calculated over a period of (up to) 10 years. Treas. Reg. §1.6011-11(c)(2).

invariably have loss ratios falling significantly below industry averages." *Ryan*, 2026 WL 1847197, at *10.

To identify captive arrangements with potential for tax avoidance or evasion, the transaction-of-interest rule uses a modified loss ratio of 60%, which Treasury determined was below the lowest industry average supported by available data. 90 Fed. Reg. at 3,541-43. For context, health insurers are entitled to certain tax benefits only if their loss ratio is at least 85%, and NAIC reported that the average annual loss ratio for property and casualty insurers was between 67.2% and 76.2% from 2012 to 2021. *Id.* at 3,542-43; 88 Fed. Reg. at 21,552-53. Even when high frequency, low severity lines of coverage were removed from the NAIC data, and NAIC's methodology was adjusted to align with the methodology used in the regulation, the average loss ratio for property and casualty insurers was approximately 66% or 67%–above the 60% loss ratio used in the final rule. 90 Fed. Reg. at 3,542. And the 60% loss ratio is calculated over the last 10 years of the captive's existence (or the entirety of the captive's existence, if it has been in existence for less than 10 years), ensuring that the below-average loss ratio is not an anomaly. *Id.* at 3,541.

Three district courts have concluded that Treasury's use of a 60% loss ratio was reasonable, including the District Court here. The U.S. District Court for the Northern District of Texas held that the "chosen loss ratio for [transactions of interest] was indeed reasonable and reasonably explained," where Treasury started with industry data, made adjustments to account for differences between that data and the type of coverage typically offered by small captives, and took into account comments received during the rulemaking process. *Ryan*, 2026 WL 1847197, at *12-13. The U.S. District Court for the Southern District of Texas similarly held that the administrative record "lays out" the logic behind this factor and "shows that the agency considered and reasonably rejected the commenters' objections to the Loss-Ratio Factor." *Drake Plastics*, 830 F. Supp. 3d at 646. And the District Court here held that Treasury had "follow[ed] a reasonably discernible path" in using a below-average loss ratio "to identify situations in which a captive arrangement may not be functioning like insurance in the commonly accepted sense." (Opin., RE.46, PageID#21426.)

b. CIC does not dispute that an insurer's history of below-average loss ratios can serve as an indicator of tax avoidance or evasion.

However, it makes a series of arguments about why it believes that a 60% loss ratio is too high. (Br. 42-44.) None withstands scrutiny.

First, relying on an opinion from the U.S. District Court for the Northern District of Texas, which denied the Government's motion to dismiss, CIC argues that the NAIC data was inapt because it included high frequency, low severity lines of coverage that captives are unlikely to provide. (Br. 42-43 (citing *Ryan, LLC v. Internal Revenue Serv.*, 2025 WL 3089415, at *13 (N.D. Tex. Nov. 5, 2025), *appeal docketed*, No. 26-10708 (5th Cir.).) However, the court later granted the Government's motion for summary judgment and held that it was reasonable for Treasury to rely on the NAIC data. *Ryan*, 2026 WL 1847197, at *12-13. The relevant portion of the earlier opinion, issued without the benefit of the administrative record, thus does little more than illuminate the different standards applicable to motions under Fed. R. Civ. P. 12(b)(6) and 56.

CIC's argument also falls on its own terms. The administrative record shows that Treasury removed high frequency, low severity lines of coverage from the NAIC data and then recalculated the industry loss ratio. 90 Fed. Reg. at 3,541-43. Even after doing so, the 60% loss ratio

chosen for the final rule was still below the industry average. *Id.* In holding that Treasury's chosen loss ratio was reasonable, two district courts have credited Treasury's adjustments to the NAIC data. *Ryan*, 2026 WL 1847197, at *12; *Drake Plastics*, 830 F. Supp. 3d at 650 n.8. CIC fails to engage with the reasoning employed by Treasury and has, therefore, forfeited any challenge thereto. *See Island Creek Coal*, 910 F.3d at 256.

Second, CIC argues that Treasury should have jettisoned the NAIC data in favor of data compiled by AM Best Company. (Br. 43-44.) However, neither the NAIC data nor the AM Best data—nor any other available dataset, for that matter—"would capture the experience of the vast majority of captive insurance companies, including micro-captive insurance companies." 90 Fed. Reg. at 3,542 (citation and internal quotations omitted). And both the NAIC and AM Best data suffer from one of the same flaws: they include coverages "such as personal automobile liability and homeowner's liability … that micro-captives are not generally permitted to cover." *Id.* Importantly, though, the AM Best data—unlike the NAIC data—was provided in a table that did not include breakdowns between lines of coverage and, correspondingly,

was not amenable to adjustments to remove high frequency, low severity lines of coverage. (Admin. Rec., RE.34-1, PageID#4929); 90 Fed. Reg. at 3,542. It was, therefore, reasonable for Treasury to prefer the imperfect NAIC data over the imperfect AM Best data. *Ryan*, 2026 WL 1847197, at *12 n.4 (citing 90 Fed. Reg. at 3,542); *Drake Plastics*, 830 F. Supp. 3d at 648-49 (citing 90 Fed. Reg. at 3,542); *see also Prometheus Radio*, 592 U.S. at 427 (agencies often lack "perfect empirical and statistical data" and are permitted to make a "reasonable predictive judgment based on the evidence" available).

Undeterred, CIC emphasizes that the AM Best data was limited to "small insurance companies" (Br. 43-44), defined as insurers with "capital and surplus up to $10 million." 90 Fed. Reg. at 3,542. According to CIC, this is significant because there would ostensibly be similarities between these "small insurance companies" and the small insurance companies eligible to make an election under I.R.C. §831(b) (*i.e.*, those with, among other things, $2.2 million or less of net written premiums). (Br. 43-44.) But this does nothing to disturb the reasonableness of Treasury's "conclu[sion] that the NAIC data was a better 'starting point,' as it could be 'modified.'" *Drake Plastics*, 830 F.

Supp. 3d at 648-49 (citing 90 Fed. Reg. at 3,542). CIC cannot establish that Treasury's reasoning was arbitrary and capricious by ignoring it. *See Island Creek Coal*, 910 F.3d at 256.

Finally, CIC renews its overinclusiveness argument, complaining that the loss-ratio factor may capture some captive arrangements that are not, in fact, abusive or avoidant. (Br. 42.) But as we explained at pp. 34-35, *supra*, "overbreadth[ ] is not automatically unreasonable." *Ryan*, 2026 WL 1847197, at *14. The purpose of the transaction-of-interest rule, as correctly articulated by the District Court, is to "trigger[ ] reporting requirements that may allow the Treasury Department and IRS to more accurately identify whether certain arrangements are 'for insurance.'" (Opin., RE.46, PageID#21429); *Drake Plastics*, 830 F. Supp. 3d at 640; *accord CIC Servs.*, 593 U.S. at 213-14. There is no serious dispute that Treas. Reg. §1.6011-11's loss-ratio factor does just that.

Tellingly, none of CIC's cited authority supports its position that a substantially lower loss ratio would be appropriate for the mine-run of small captives. (Br. 40-41.) *R.V.I. Guar. Co. & Subsidiaries v. Commissioner*, 145 T.C. 209 (2015), concerned a large, non-captive

insurer that issued extraordinary policies providing "catastrophic-type coverage." *Drake Plastics*, 830 F. Supp. 3d at 650 n.8 (discussing *R.V.I.*); (Opin., RE.46, PageID#21,427). *Puglisi v. Commissioner*, 2021 WL 7162530 (Tax Ct. Oct. 29, 2021), involved the IRS's concession of the adjustments in its notices of deficiency without any corresponding determination or "concession on the merits." *Drake Plastics*, 830 F. Supp. 3d at 650 n.8 (discussing *Puglisi*); 90 Fed. Reg. at 3,541 (same). And the expert report on which CIC relies acknowledged that a reasonable loss ratio for an insurer could, under the right circumstances, fall anywhere "between 10% and 90%" annually. (Admin. Rec., RE.43-1, PageID#15479.) However, the expert opined that, in general, "[f]or a captive with low expenses, it might be reasonable to expect that the loss ratio should stay relatively high, usually higher than 65%." (*Id.*, PageID#15485.) And the expert's opinion was based on the NAIC methodology that, unlike the regulations, excludes certain claim administration expenses and policyholder dividends which would raise the expected loss ratio even higher. *Supra*, p. 38 n.3.

#### ii. The related-party financing factor is reasonable

As we have explained, Treasury's central concern with captive insurance arrangements is "the indefinite deferral of tax." 90 Fed. Reg. at 3,546. That concern "may be compounded by the use of tax-deferred income for the personal benefit of the related persons involved." *Id.* In particular, where the insurer loans premium payments back to its commonly owned insureds, those premium payments "have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted." *Id.* And the fact that the insurer is willing to loan premium payments back to the insured parties is an indication that the participants are confident the insurer's reserves will never be called upon to pay claims. *Drake Plastics*, 830 F. Supp. 3d at 647 (citing *Keating*, T.C. Memo. 2024-2, at *31); 90 Fed. Reg. at 3,541 (citing *Keating*). Understood within this framework, the related-party financing factor "identifies the heart of the agency's tax-avoidance concern." *Drake Plastics*, 830 F. Supp. 3d at 644.

As documented in the administrative record, this concern is borne out by caselaw evaluating the legitimacy of captive insurance

arrangements. Where one or more insureds pays premiums to an insurer, only to have the insurer return the funds to the insureds, the arrangement begins to "look[ ] suspiciously like a circular flow of funds." *Reserve Mechanical*, 34 F.4th at 905-06; 90 Fed. Reg. at 3,556 (citing *Reserve Mechanical*). "It is well settled that 'a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes.'" *Drake Plastics*, 830 F. Supp. 3d at 638-39 (quoting *Patel*, 165 T.C. at 194); 90 Fed. Reg. at 3,546 (citing *Patel* T.C. Memo. 2024-34). Accordingly, an arrangement in which funds pass from the insured to the insurer and then back to the insured is less likely to constitute insurance for federal tax purposes. *Swift*, T.C. Memo. 2024-13 at *18-19; 90 Fed. Reg. at 3,546 (citing *Swift*). Indeed, even outside the tax context, "[i]nsurance regulators often raise their bureaucratic eyebrows at related-party dealings." *Avrahami*, 149 T.C. at 170; 90 Fed. Reg. at 3,546 (citing *Avrahami*).

To be sure, there may be circumstances in which a captive insurer's related-party financing is not, in fact, abusive or avoidant. (Br. 39.) But here again, "overbreadth[ ] is not automatically unreasonable." *Ryan*, 2026 WL 1847197, at *14; *supra*, pp. 34-35, 44.

And even where a court has determined that a captive's related-party financing was legitimate, it did so only after acknowledging the concerns associated therewith and scrutinizing the financing's terms. *Id.* (citing *Avrahami*, 149 T.C. at 168-71).[4] CIC has identified no authority which "stands for the proposition that related-party financing cannot signal a potential for tax avoidance," much less cast doubt on Treasury's "ultimate decision that related-party financing reflects a potential for tax avoidance." *Id.*

**c. Treasury's reliance on caselaw and audits was reasonable**

As a last resort, CIC attacks Treasury for relying on not only industry data, expert reports, and comments, but also caselaw and examinations. (Br. 34-38.) However, an agency can, and should, "rely on its experience" in the regulated field when it engages in rulemaking.

[4] CIC cites *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1, 11-12 (2014), as having held that "related-party financing by [the] captive was not an impermissible 'circular flow of funds.'" (Br. 13.) But the "circular flow of funds" addressed in *Rent-A-Center* was the captive's purchase of shares in its publicly traded parent. 142 T.C. at 11. The captive did not provide financing to a commonly owned insured, as contemplated by the regulations at issue. Nor would the arrangements in *Rent-A-Center* have been reportable anyway, as the captive did not make an election under I.R.C. §831(b) to exclude its premiums from income.

*Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010); *see Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021) (citing *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 546-47 (D.C. Cir. 1997)). Here, the IRS has experience examining purported insurance arrangements and defending the results of those examinations in court, 90 Fed. Reg. at 3,538, 3,544, 3,546, and Treasury reasonably drew on this experience when it issued the rules at issue, *Drake Plastics*, 830 F. Supp. 3d at 645 n.5.

CIC nonetheless complains that the administrative record "identifies only seven individual cases of abuse" involving a captive insurer. (Br. 37.) But in reality, the administrative record identifies *several dozen* cases addressing what does, and does not, constitute insurance for federal tax purposes. 90 Fed. Reg. at 3,535-56. While some of those cases involved large insurers, non-captive insurers, or arrangements that were held to constitute valid insurance, they were still part of the body of experience that informed the rulemaking process and cannot be dismissed out of hand. Indeed, it is significant that Treasury was able to rely on as much caselaw as it did, given that one of the primary purposes of the reportable transaction regime is to

enable Treasury to "[i]dentify[ ] questionable transactions early … and issue guidance, in some cases before the transactions even show up on tax returns." *Corporate Tax Shelters: Looking Under the Roof*, Hearing Before the S. Comm. on Fin., 107th Cong., 8 (2002). In any event, there is no minimum amount of tax evasion or avoidance that must occur, much less be reflected in caselaw, before Treasury addresses it through the reportable transaction regime.

Also unavailing is CIC's complaint that the administrative record included caselaw, but "no data from taxpayer examinations." (Br. 20.) Each of the dozens of cases identified in the administrative record *was the result of a taxpayer examination*. CIC's attempt to draw a bright-line distinction between the two is, therefore, misguided. Moreover, caselaw that results from examinations is markedly superior to raw examination data, as it represents an IRS position that has been tested through the adversarial process.

Caselaw and examination data also differ in another material respect: the former is publicly available while the latter must be kept confidential, under penalty of civil and criminal sanctions. I.R.C. §§6103, 7213, 7213A, 7431. This poses a unique obstacle to including

such examination data in the administrative record, as another district court recognized. *Drake Plastics*, 830 F. Supp. 3d at 645 n.5. And that obstacle cannot be overcome by simply redacting taxpayers' identifying information from examination files. *Ryan*, 2026 WL 1847197, at *9 (citing *Church of Scientology of Cal. v. I.R.S.*, 484 U.S. 9, 18 (1987)); *see also MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 13 (D.C. Cir. 1998) (upholding agency decision to exclude confidential information from the administrative record).

In fairness, Treasury can "disclos[e] tax-return data in an aggregated, anonymized form." (Br. 20 (citing I.R.C. §6103(b)(2).) But this is precisely what Treasury did when it represented that the fact patterns associated with abusive arrangements in caselaw were consistent with the fact patterns associated with abusive arrangements in current examinations. 90 Fed. Reg. at 3,538. Although CIC may have preferred that Treasury "quantif[y] [its examination experience] in the form of a study," the APA imposes no such requirement. *Sacora*, 628 F.3d at 1069 (citing *State Farm*, 463 U.S. at 43).

Of course, confidentiality concerns do not relieve an agency from the obligation to show that it engaged in reasoned decisionmaking. *In*

*re NTE Conn.*, 26 F.4th 980, 988-89 (D.C. Cir. 2022) (Br. 35). But this is not a case in which Treasury has "cryptically asserted that it could not explain its decision because … [of] confidentiality concerns," *id.* at 988, or "given no reasoned explanation" for "hid[ing] the evidentiary ball," *Flyers Rights Educ. Fund, Inc., v. F.A.A.*, 864 F.3d 738, 746 (D.C. Cir. 2017) (Br. 35-36). To the contrary, Treasury has copiously explained its reasoning, compiled a voluminous administrative record, and "disclose[d] as much information publicly as it can." *Flyers Rights*, 864 F.3d at 745. No more is required.

### 3. Treasury's identification of a new transaction-of-interest category was consistent with the PATH Act

a. As discussed, there is no evidence that Congress had captive insurance arrangements in mind when it enacted I.R.C. §831(b) in 1986. *Supra*, p. 10 n.1. However, Congress did have captives in mind approximately 30 years later when it amended §831(b) via the Protecting Americans from Tax Hikes Act of 2015 ("PATH Act"), P.L. 114-113, 129 Stat. 2242, 3040, 3106-3107, Div. Q. The PATH Act addressed closely held family businesses using captive insurance arrangements for estate-planning purposes, rather than risk

management. (Admin. Rec., RE.34, PageID#4066-4068.) For example, a business in which a father and son held 70% and 30% ownership interests, respectively, might establish a captive insurer owned solely by the son. (*Id.*, PageID#4068.) In that example, the business could pay up to $2.2 million in premiums to the captive each year and thereby increase the son's interest in the cash from $660,000 (*i.e.*, 30%) to $2.2 million (*i.e.*, 100%), without triggering estate and gift taxes. (*Id.*)

To address this issue, the PATH Act limited the ability of closely held insurers to make an I.R.C. §831(b) election. As amended, the provision provides that an insurer is generally ineligible to make an §831(b) election if more than 20% of its net written premiums is attributable to a single policyholder. I.R.C. §831(b)(2)(B)(i)(I). A captive with more than 20% of its premiums attributable to a single policyholder can only make an §831(b) election if lineal descendants, spouses, and other "specified holders" own roughly equal interests in the insured business and the captive insurer. I.R.C. §831(b)(2)(B)(i)(II), (B)(ii)-(iii). Thus, in the example above, the captive insurer would not be eligible to make an §831(b) election because the son's interest in the

captive (100%) far exceeds his interest in the insured business (30%). (Admin. Rec., RE.34, PageID#4068.)

b. CIC seizes on the above limitation and argues that, by prohibiting captive insurers with certain ownership structures from making an I.R.C. §831(b) election, Congress "specifically approved" captive arrangements with any structure that fell outside the prohibition. (Br. 33.) This badly misreads the prohibition, as two district courts have recognized.

As the district court in *Drake Plastics* explained, "courts do not 'indulge in the loose assumption that when Congress adopts a new' statute, 'it thereby deals with all situations falling within the general mischief which gave rise to the legislation.'" 830 F. Supp. 3d at 636 (quoting *Kirschbaum v. Walling*, 316 U.S. 517, 521 (1942)). After all, "statutes 'may,' and often do, 'take one step at a time, addressing [themselves] to the phase of the problem which seems most acute …'" *Id.* (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)). Viewed through this prism, the best reading of the amendment to I.R.C. §831(b) is not an endorsement of all captive insurance arrangements that fall outside the new prohibition, but rather that

Congress intended to "stamp out only out the worst abuses and the most likely tax-evasive transactions"—namely, closely held family businesses using captives for estate-planning purposes. *Drake Plastics*, 830 F. Supp. 3d at 636.

Indeed, as another district court recognized, "[i]t is hard to see any limiting principle" to the contrary argument advanced by CIC. *Ryan*, 2025 WL 3089415, at *11 & n.9. For example, Congress granted pass-through taxation status to "S Corporations," but that does not mean that any reportable transaction designation that covers some S Corporations necessarily undermines congressional intent. *Id.* So too here with purported insurance companies making an I.R.C. §831(b) election, as the District Court recognized. (Opin., RE.46, PageID#21429.)

c. CIC's reliance on proposed legislation that was never enacted is even farther afield. (Br. 33.) It is well-established that Congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (citations and internal quotations omitted).

Moreover, there is significant daylight between the proposed legislation and the transaction-of-interest designation in Treas. Reg. §1.6011-11. The former would have barred any captive from making an I.R.C. §831(b) election if more than 20% of its net written premiums were attributable to a single policyholder. (Admin. Rec., RE.34, PageID#3855.) The latter simply imposes a reporting requirement on insurers with such ownership structures *if* the arrangement also has one or more other characteristics commonly associated with tax evasion or avoidance. In addition, the former would have barred any captive from making an §831(b) election if it entered into a reinsurance arrangement. (*Id.*) The latter does no such thing. CIC's attempt to conflate the two falls flat.

### C. The District Court correctly held that Treasury acted within its authority and engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as listed transactions

The District Court separately held that Treasury acted within its statutory authority and engaged in reasoned decisionmaking when it promulgated the listed-transaction rule. Although that holding conflicts with a subsequent decision by another district court, it should

be affirmed as a faithful application of the APA to the rulemaking process that produced Treas. Reg. §1.6011-10.[5]

**1. Treasury's identification of a new listed-transaction category was consistent with the text and purpose of I.R.C. §6707A(c)(2)**

a. By statute, Treasury is authorized to "specifically identif[y] … tax avoidance transaction[s]" as "listed transactions" that must be affirmatively disclosed to the agency. I.R.C. §6707A(c)(2); *see* Treas. Reg. §1.6011-4(b)(2). After reviewing the evidence before it, Treasury determined the micro-captive arrangements described in Treas. Reg. §1.6011-10 qualified as listed transactions. *See*, *e.g.*, 90 Fed. Reg. at 3,540-41 (discussing how the regulation was tailored to capture "those transactions that are properly identified as listed transactions rather than as transactions of interest"). Consequently, the District Court had little difficulty in holding that Treasury acted within its statutory authority when it promulgated Treas. Reg. §1.6011-10. (Opin., RE.46, PageID#21419-21420.)

---

[5] CIC advances many of the same arguments with respect to both the transaction-of-interest regulation and the listed-transaction regulation. (*E.g.*, Br. 31-34 (arguing that both regulations are inconsistent with the PATH Act).) For simplicity, we address those arguments only once.

b. In resisting this result, CIC seizes (Br. 25) on a portion of the final rule stating that "the regulations identify fact patterns that are consistently associated with transactions that are *or may be* tax avoidance transactions." 90 Fed. Reg. at 3,546 (emphasis added). And because this language appears under a heading discussing Treas. Reg. §1.6011-10, CIC argues that Treasury has "expressly disclaim[ed] a finding that" the arrangements covered thereunder *are* tax avoidant. (Br. 25-26.) This argument misses the mark.

The final rule addresses two regulations: Treas. Reg. §1.6011-10, which covers listed transactions, and Treas. Reg. §1.6011-11, which covers transactions of interest. 90 Fed. Reg. at 3,535. And the particular language on which CIC relies discusses not simply the listed-transaction regulation, but "*the regulations*" plural. *Id.* at 3,546 (emphasis added). There is, therefore, nothing inconsistent with maintaining, on one hand, that the arrangements covered by §1.6011-10 *are* tax avoidant while stating, on the other hand, that the arrangements covered by §§1.6011-10 and 1.6011-11 *are or may be* tax avoidant.

Indeed, throughout the final rule, Treasury evinced a clear understanding of the distinction between the listed transactions in Treas. Reg. §1.6011-10 (which are tax avoidant) and the transactions of interest in Treas. Reg. §1.6011-11 (which have the potential for tax avoidance or evasion). *E.g.*, 90 Fed. Reg. at 3,534, 3,539, 3,541. In its notice of proposed rulemaking, Treasury did likewise. *E.g.*, 88 Fed. Reg. at 21,554, 21,557.

c. Perhaps realizing this problem, CIC moves the goalposts. It is not enough, CIC contends, that Treasury may have followed the text of I.R.C. §6707A(c)(2) and specifically identified an arrangement as a tax-avoidance transaction. Instead, CIC contends that Treasury can only designate a listed transaction if it first determines that the arrangement constitutes, or at least presumptively constitutes, a "sham" or other "abuse." (Br. 21-24.)

The fundamental problem with CIC's argument is that it is completely untethered from the text, structure, and history of I.R.C. §6707A(c)(2). Had Congress wanted to define "tax avoidance" as a "tax sham" or "tax abuse," it could have done so. It did not. This Court should therefore afford the term "avoidance" its ordinary meaning,

namely "to keep away from." https://www.merriam-webster.com/dictionary/avoid (last visited Sept. 9, 2026); *see Commissioner v. Soliman*, 506 U.S. 168, 174 (1993) (undefined terms in tax statutes should be afforded their ordinary meaning). In the context of §6707A(c)(2), this would mean a transaction specifically identified by Treasury as enabling taxpayers to "keep [themselves] away from" tax for which they would otherwise be liable.[6] *See* 90 Fed. Reg. at 3,553 ("participation in a listed transaction that involves a purported insurance arrangement means that the taxpayer is claiming tax benefits each year to which the taxpayer is not entitled"); 88 Fed. Reg. at 21,559 ("the IRS will take the position that taxpayers are not entitled to the purported tax benefits of the listed transactions").

This meaning is consistent with the distinction that courts have drawn between sham transactions, on one hand, and transactions with a tax-avoidant purpose, on the other. A transaction is a "sham" if it

---

[6] CIC notes that I.R.C. §4965(e) designates "listed transactions" as "prohibited tax shelter transactions" for certain tax-exempt entities. (Br. 22.) But the statute makes clear such transactions are not "prohibited" in the ordinary sense of the word, but simply transactions for which those organizations may be subject to an additional tax. I.R.C. §4965(a).

lacks "any practicable economic effects other than the creation of income tax losses." *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006). A transaction motivated solely by tax avoidance, however, may well have economic substance even if its claimed tax benefits are disallowable on other grounds. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 & n.13 (Fed. Cir. 2006) (citing *Dow Chem.*).

To be sure, an arrangement that constitutes a tax sham or tax abuse would also qualify as tax avoidant, and it is unsurprising that the IRS has sometimes made passing reference to listed transactions as shams, abusive, or the like. *E.g.*, *Listed Transactions and Transactions of Interest*, 2023-17 I.R.B. 798, 798; *see also*, *e.g.*, *Thompson v. Commissioner*, 148 T.C. 59, 67 (2017). But these references do not purport to interpret the limits of Treasury's statutory authority and, even if they did, could not trump the plain language of the statute. At all events, whether the IRS "considers [a listed transaction] to be an abusive tax avoidance transaction," I.R.M. Exhibit 4.32.1-1, is a different inquiry than whether Treasury exceeds its statutory authority by designating a listed transaction without making a specific finding of abuse. It does not. Regardless, Treasury *did* make a finding of abuse,

rendering this line of argument largely academic. 88 Fed. Reg. at 21,554; *see* 90 Fed. Reg. at 3,538, 3,546.

Nor can CIC save its exceeds-statutory-authority argument by repackaging it as an unexplained change from the position taken in the Internal Revenue Manual. (Br. 22-23.) As explained at pp. 26-27, *supra*, there is no basis to extend the change-in-position doctrine to informal guidance that is neither intended to establish agency policy nor engender reliance interests. *See also Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir. 1996) ("The provisions of the [Internal Revenue] [M]anual … only govern the internal affairs of the Internal Revenue Service. They do not have the force and effect of law."). And the change-in-position doctrine is further inapplicable where, as here, the issue is the best reading of the statute. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236-39 (D.C. Cir. 2026).

#### 2. Treasury's identification of a new listed-transaction category was reasonable and reasonably explained

We now turn to the substance of the listed-transaction rule. Like the transaction-of-interest rule, the listed-transaction rule used three

criteria: (a) the relationship test, (b) the loss-ratio factor, and (c) the related-party financing factor. Treas. Reg. §1.6011-10(b)(1), (c)(1) & (2). Importantly, though, Treasury dramatically reduced the loss-ratio factor, from 60% to 30%, and required that a captive insurer maintain an average loss ratio below this mark for at least the preceding 10 years. *Id.* §1.6011-10(b)(2)(ii), (c)(2). Just as important, Treasury provided that an arrangement only satisfies the listed-transaction rule if all three criteria are satisfied, rather than just two of the three. *Id.* §1.6011-10(b)(1), (c). As discussed below, the District Court correctly held that this rule was reasonably calculated to identify tax-avoidance transactions.

a. We begin by addressing Treasury's decision to use a modified loss ratio of 30%. As discussed, Treasury used industry data to determine that the 60% loss ratio for transactions of interest was below the industry average. *Supra*, p. 39. This determination was consistent with an expert's opinion that, in general, it would be reasonable for a low-expense captive to maintain a loss ratio above 65%. *Supra*, p. 45. And because a consistently below-average loss ratio indicates that premiums are being priced in a way that does not reflect economic

reality, Treasury initially proposed using the same loss ratio for listed transactions as it was using for transactions of interest. 88 Fed. Reg. at 12,553.

Treasury received numerous comments suggesting that, because participation in a listed transaction carries the potential for a higher maximum penalty than a transaction of interest, the loss ratio should be lower. 90 Fed. Reg. at 3,540-41. But the commenters could not point to any publicly available data justifying a significant reduction from the average loss ratio derived from the NAIC data. *Id.* at 3,542. They did, however, point to the Tax Court's opinion in *R.V.I.*, where an arrangement qualified as insurance even though the insurer's loss ratio averaged only 32% over a 13-year period. *Id.* at 3,541 (citing 145 T.C. at 215-16). In an effort to accommodate the commenters' concerns, Treasury adopted a 30% loss ratio drawn from *R.V.I.* 90 Fed. Reg. at 3,541. Treasury also provided that an arrangement would not qualify as listed transaction unless the insurer had been in existence for at least a decade and maintained a loss ratio below 30% for the preceding 10 years. *Id.* These changes from the proposed rule "significantly narrow[ed] the scope" of the listed-transaction category. *Id.*

On appeal, CIC criticizes the 30% loss ratio as arbitrary, boldly asserting that it was "more than sufficient" to constitute legitimate insurance in *R.V.I.* (Br. 40, 43.) This misses the point. Treasury did not use the 30% loss ratio because it established an appropriate metric for evaluating the mine-run of small captive insurers. To the contrary, the insurer in *R.V.I.* was a large, non-captive insurer that provided catastrophic-type coverage. *Drake Plastics*, 830 F. Supp. 3d at 650 n.8 (discussing *R.V.I.*); (Opin., RE.46, PageID#21427). Treasury used the 30% loss ratio because it wanted to accommodate the concerns of commenters, and 30% was the lowest possible metric that could be justified by publicly available data. 90 Fed. Reg. at 3,540-41.

b. Treasury also made a second change that "significantly narrow[ed] the scope" of the listed-transaction category. 90 Fed. Reg. at 3,541. Unlike the transaction-of-interest rule, which was satisfied if *either* the loss-ratio or related-party financing factor was met, the listed-transaction was phrased in the conjunctive, requiring that *both* be met. Treas. Reg. §1.6011-10(c). In other words, an arrangement was deemed tax avoidant only if it involved (a) a closely, held small captive (b) that maintained a substantially below-average loss ratio for at least

a decade *and* (c) nonetheless chose not to lower its premiums or issue dividends to its policyholders, but rather loaned its premium payments back to the commonly owned insureds or other affiliates on a tax-free basis. Although Treasury did not need to call this arrangement abusive to designate it as a listed transaction, it did. *Supra*, pp. 61-62. And rightly so: there is no objective reason why a legitimate insurer would operate this way in the ordinary course. CIC does not contend otherwise.

Instead, CIC argues that none of the individual criteria, standing alone, is indicative of tax avoidance. (Br. 38-45.) This argument is incorrect for the reasons we discussed at length in the transaction-of-interest context. *Supra*, pp. 30-48. And it becomes simply untenable when all three criteria, including the substantially reduced loss ratio, occur together.

c. The U.S. District Court for the Southern District of Texas, however, reached a different conclusion. *Drake Plastics*, 830 F. Supp. 3d at 641-42. In its view, the administrative record did not "support a finding that the transactions designated by § 1.6011-10 are presumptively not really for insurance." *Id.* at 641; *see also Green Rock*

*LLC v. Internal Revenue Serv.*, 104 F.4th 220, 225 (11th Cir. 2024) (describing listed transactions as "presumptively tax-avoidant"). To support such a finding, the court opined that Treasury would have needed to determine the number of "captives [that] qualify under § 1.6011-10," determine the number of "those qualifying captives [that] have been evading taxes," and then demonstrate that the qualifying transactions are tax avoidant most of the time. *Drake Plastics*, 830 F. Supp. 3d at 641. This standard is incorrect for at least three reasons.

First, the court put the proverbial cart before the horse. The purpose of the listed-transaction regime is to require that taxpayers affirmatively disclose their participation in tax-avoidance transactions so the IRS can examine them. *Supra*, pp. 5-6. However, the court's standard requires that the IRS identify and examine the full universe of tax-avoidant transactions *before* imposing a reporting requirement.

Second, the court failed to give sufficient weight to the discretion that Treasury is afforded in determining which transactions are reportable. In particular, Congress defined a "listed transaction" as one "specifically identified by the Secretary as a tax avoidance transaction." I.R.C. §6707A(c)(2); *see also* I.R.C. §6707A(c)(1) (defining a "reportable

transaction" as a transaction of a type that "the Secretary determines as having a potential for tax avoidance or evasion"). And it has long been understood that this determination is distinct from whether the transaction should be respected for tax purposes, as taxpayers remain free to dispute the IRS's characterization and have a court decide their liability *de novo*. (Opin., RE.46, PageID#21419-21420.)

Finally, the court faulted the listed-transaction rule for encompassing "some legitimate transactions as well as those that are abusive." *Drake Plastics*, 830 F. Supp. 3d at 641. But the listed-transaction regime requires only that Treasury "provide taxpayers with a 'bright line' and 'clear and objective' definition of the specific conduct that the Service considers presumptively suspicious and subject to heightened disclosure." *Green Rock*, 104 F.4th at 223 (quoting Elaine Church & Corina Trainer, *Reportable Transactions: A Comprehensive Disclosure Regime to Combat Tax Shelters*, 57 Major Tax Planning 12-1, 12-8 (2005)). In other words, Treasury is required to draw reasonable lines defining tax-avoidance transactions, not perfect lines. It did so here, and the court erred in requiring more.

### D. If this Court were to reverse in whole or part, the District Court should have an opportunity to determine an appropriate remedy in the first instance

In passing, CIC says that this Court should remand the case "with instructions to … set aside the Final Rule." (Br. 45.) But because CIC seeks equitable relief, the District Court should pass on the propriety thereof in the first instance, taking into account what CIC needs to be made whole, the pendency of related litigation in another circuit, etc. *See State of Neb. Dep't of Health and Human Servs. v. Dep't of Health and Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (vacatur decision reviewed for abuse of discretion); *Green Rock*, 104 F.4th at 229 (setting aside listed-transaction rule as to the plaintiff only).

## CONCLUSION

The judgment of the District Court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
JOSHUA WU
*Deputy Assistant Attorney General*

/s/ *Geoffrey J. Klimas*

FRANCESCA UGOLINI (202) 514-3361
ELLEN PAGE DELSOLE (202) 514-8128
GEOFFREY J. KLIMAS (202) 307-6346
*Attorneys, Tax Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

SEPTEMBER 11, 2026

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 12,992 words, **or**

[ ] this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ] this brief has been prepared in a monospaced typeface using ____________________ with ________________.

(s) /s/ *Geoffrey J. Klimas*

Attorney for Appellees

Dated: September 11, 2026

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

### Pursuant to Sixth Circuit Rule 30(g)

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 1-23 |
| 20-2 | Administrative Record Index | 119-128 |
| 21-1 | King Declaration | 172-176 |
| 34 | Administrative Record | 3441-4918 |
| 34-1 | Administrative Record | 4919-8955 |
| 42-2 | Administrative Record | 12779-13390 |
| 43-1 | Administrative Record | 14270-15493 |
| 46 | Opinion | 21412-21431 |
| 47 | Judgment | 21432 |
| 48 | Notice of Appeal | 21433-21434 |